IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MCDONALD OLIVER<br>1001 Franklin Street<br>Croydon, PA 19021<br><br>     Plaintiff,<br>v.<br><br>UNIVERSAL HEALTH SERVICES INC.<br>d/b/a UHS<br>367 South Gulph Road<br>King of Prussia, PA 19406<br>   and<br>THE HORSHAM CLINIC<br>722 E. Butler Pike<br>Ambler, PA 19002<br><br>     Defendants | CIVIL ACTION<br><br>No. _____<br><br><br><br>**JURY TRIAL DEMANDED** |

## CIVIL ACTION COMPLAINT

McDonald Oliver, (hereinafter, referred to as "Plaintiff"), by and through his undersigned counsel, hereby avers as follows:

### I. INTRODUCTION

1. This action has been initiated by Plaintiff for violations of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 - (42 U.S.C. §§ 2000e, *et. seq.*), the Age Discrimination in Employment Act ("ADEA" - 29 U.S.C. §§ 621 *et. seq.*)**,** and the Pennsylvania Human Relations Act, 43 Pa.C.S. § 951 *et seq.* ("PHRA").[1] As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

---

[1] A reference to claims under the PHRA are made herein only for notice purposes. Plaintiff's case was administratively closed with the EEOC and he has thus been required to timely initiate the instant lawsuit. However, he will seek leave to amend this complaint by adding identical claims (as alleged under ADEA/Title VII) under the PHRA once such claims are also fully administratively exhausted.

## II. JURISDICTION AND VENUE

2. This Court, in accordance with 28 U.S.C. § 1331, has jurisdiction over Plaintiff's claims because this civil action arises under laws of the United States.

3. This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in International Shoe Co. v. Washington, 326 U.S. 310 (1945) and its progeny.

4. Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and Defendants are deemed to reside where it is subject to personal jurisdiction, rendering Defendant a resident of the Eastern District of Pennsylvania.

## III.   PARTIES

5. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

6. Plaintiff is and adult individual with an address as set forth above.

7. Defendant Universal Health Services Inc., d/b/a UHS is a large hospital and healthcare services provider, with over 89,000 employees (operating 28 acute care hospitals, 335 behavioral health inpatient facilities and 40 outpatient facilities and ambulatory centers) located throughout the United States and even abroad.

8. Defendant Horsham Clinic is just one behavioral health facility wholly owned and operated by Defendant Universal Health Services Inc., and is the facility where Plaintiff worked during his tenure.

9. While Plaintiff was physically placed to work at Defendant Horsham Clinic, at all times Defendants can be considered joint employers as Defendants have shared operations and control over their facilities and employees; moreover, Defendant UHS paid Plaintiff, and issued all policies and procedures to Plaintiff under their employee handbook, exerting significant control over the terms and conditions of Plaintiff's employment.

10. At all times relevant herein, Defendants acted by and through their agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

## IV. FACTUAL BACKGROUND

11. The foregoing paragraphs are fully incorporated herein as though set forth at length.

12. Plaintiff is a 58-year-old black, foreign born male (from Nigeria) who speaks with a discernable accent.

13. Plaintiff was hired by Defendants to work at their Horsham Clinic beginning on or about February 23, 2013.

14. In total, Plaintiff worked for Defendants for 9.5 years before he was falsely told that his job was being "eliminated," and only after a series of incidents very clearly demonstrating mistreatment toward Plaintiff based upon his race, ethnicity and/or advanced age – and after escalating complaints of discrimination were made by Plaintiff.

15. Plaintiff witnessed firsthand a culture of racism while working for Defendants; based upon Plaintiff's experiences there, racist behaviors were tolerated, perpetuated and not mitigated in any manner.

16. By way of background on the racial composition of the workplace at Defendant Horsham Clinic, *at least* 95% of the staff is comprised of minorities or black.

17. However, as an estimate, more than 95% of the management is Caucasian and non-black.

18. In fact, Plaintiff was the only black male in management (as will be discussed *infra*) on the nursing management team at Horsham clinic until he was demoted.

19. Despite a high level of black or minorities being available in the regional labor pool, Defendants choose to avoid such usage or consideration(s) *for management*.

20. Plaintiff was originally hired to work for Defendants as a Counselor, and progressed to working for Defendants as a Group Leader.

21. As a Group Leader, Plaintiff regularly supervised employees and managed aspects of the facility.

22. When needed, Plaintiff filled in as a counselor, a mental health technician (MHT), or in other capacities while employed as a Group Leader.

23. Plaintiff worked a Group Leader until being promoted on or about July 2, 2021 to the position of Supervisor.

24. As a supervisor, Plaintiff then oversaw over 100 employees, gave tours, trained others, reported statistics, resolved facility problems, and handled many other broad types of duties.

25. Plaintiff was promoted to the position of Supervisor by Joan Mahajan (Chief Nursing Officer); however, Mahajan retired effective on or about April 30, 2022.

26. To get promoted, Plaintiff had to work extremely hard; Plaintiff worked tremendous overtime, assisted in almost every capacity and in almost every unit anytime needed, and suffered severe assaults throughout his tenure.

27. Plaintiff cared for extremely dangerous individuals housed in different units, some of whom repeatedly hit Plaintiff, nearly blinded him, and also for example struck him with furniture.

28. Plaintiff worked tirelessly to establish bonds with staff, peers, and those receiving care institutionally.

29. Given all his efforts, Plaintiff received awards during his tenure, and he had no discipline before being elevated to the aforesaid management role.

30. To give just some history of the types of racism that he experienced in the years leading up to his termination, Plaintiff will provide *herein* only 2 examples (of many) for brevity purposes:

   a.) In 2018, Plaintiff discussed with executive management and human resources the assignment of additional duties to his role, which would include him also working as a Team Leader. Although encouraged by several managers to interview for this additional title, Plaintiff was told even though he had worked as of this time for more than 5 years, the company was only seeking a candidate with longer internal tenure. However, Plaintiff then came to learn that Defendants actually hired Nick Boss, a Caucasian male in his 30s (as to age). Not only did he not have longer tenure than Plaintiff, but he was a new hire. Additionally, Plaintiff was asked to train him for 2 weeks which he did. It became apparent he was very underqualified for the role (from his discussions with Plaintiff). In fact, the reason someone with several years of

experience is required for the role is because it is very challenging to get acclimated with Defendants' units, the dangers, operations, and protocols. Boss was merely a high school graduate, whereas Plaintiff had a bachelor's degree. Boss thereafter quit after roughly 5 months explaining he couldn't handle the job and was in over his head.

b.) In October of 2021, Plaintiff had been promoted to the position of Supervisor for roughly 3 months. After having a nice office space for nearly 3 months, Plaintiff walked into his office and was met by a woman named Pat Schoenfeld. Schoenfeld was a new hire and a Caucasian woman who was ostensibly supposed to share office space with Plaintiff. She was hired as a patient advocate (<u>not even working in management</u>). She was rude, stating she didn't want anything missing from her work area (as if Plaintiff would steal from her). Within 1 day, all of Plaintiff's items were packed up and he was being moved out of the office (without his knowledge). Plaintiff approached Mahajan very upset about how he was being treated. Mahajan told Plaintiff the woman claimed she was worried he was going to take her things and did not want to share an office with Plaintiff. Mahajan said the truth is "she just doesn't want to share an office with a black man." Plaintiff told Mahajan "this is not okay, this is discrimination." Mahajan just agreed with Plaintiff and said she would get him a new office. Nearly a month later, Plaintiff was directed to meet in a parking lot and shown a small corner in part of a building he could use if he wanted to do any work. It was not suitable for any work: it was dingy, and appalling. As a result, Plaintiff worked thereafter with no dedicated workspace *as a Supervisor* (unlike my Caucasian counterparts).

31. Mahajan was not someone Plaintiff generally felt discriminated against by on a targeted-basis, as she in fact promoted Plaintiff to Supervisor; however, the issue with Mahajan was primarily that Plaintiff had expressed <u>on numerous occasions</u> racially discriminatory problems or experiences.

32. Mahajan didn't care, and she told Plaintiff things like, "ignore it, don't worry and just keep doing a good job," or other statements suggesting Plaintiff not make any waves.

33. On some occasions, she admitted Plaintiff was experiencing discrimination when she observed or he relayed instances of disparate treatment; as a result, she was part of the problem and perpetuation of the racially discriminatory culture.

34. After Mahajan retired effective late April 2022, she was succeeded by Ashley Needles (temporarily) and then Jessie Martori officially as of on or about June 3, 2022.

35. Needles and Martori were both Caucasian.

36. Plaintiff was also indirectly supervised by Kim Whitelock, Chief Executive Officer ("CEO") and Managing Director, also Caucasian.

37. From a Human Resources perspective, Plaintiff was generally overseen by Kevin Courtney, a Director of Human Resources (who is Caucasian).

38. Courtney played a significant part in Plaintiff's pretextual termination (discussed *infra*), as he is very close friends with Darryl Saylor (a Caucasian and significantly younger than Plaintiff) whom Defendants were attempting to surreptitiously use to replace Plaintiff under the guise of a job elimination.

39. Upon Mahajan retiring, there became a campaign that was not at all concealed to end Plaintiff's employment by forcing him to quit the job (mostly at the behest of Whitelock).

40. The work environment was so hostile, Plaintiff literally was getting emotional on many days of his job about how badly he was being treated. By way of <u>examples</u> only:

i. Plaintiff was being called to human resources to ask him about anything or everything he was doing in the workplace. He would be asked about discussions or comments with others, how he handled a situation, if he was wearing a mask properly, whether he worked a full day and what time he arrived or left work, asked whether he said anything negative about management, and demands for him to appear at human resources were so frequent that he literally developed anxiety from even showing up to work because he just expected weekly scrutiny. Much of this scrutiny was being facilitated by Taylor Cowan (Caucasian)(an HR Generalist), at the direction of her management.

ii. Plaintiff was informed by human resources that an anonymous complaint was filed about him accusing him of various improprieties. Plaintiff came to learn that it was not anonymous, and Cassandra Byrd shared with him that she was directed to write an "anonymous" letter to human resources by Cowan to prompt an investigation of him.

iii. Plaintiff was informed by Tiona Bond that she was being asked to make a false complaint about Plaintiff to help get him out of the facility (which she refused to do).

iv. By early May 2, 2022, Plaintiff started being stripped of all of his duties as a supervisor. At the direction of Whitelock, Plaintiff was directed to abandon his management duties and solely work within Adolescent Unit 3 only and investigate why so many people within the unit are able to continually have sex. Within 2 weeks, Plaintiff prepared a full report with recommendations to implement. Not a single recommendation was implemented, Plaintiff was not asked about his investigation, and he had been placed there (merely as a busy work) just to (initiate the process to) stop using Plaintiff in management with no care about his findings (or the health of the adolescents).

v. Plaintiff was a former group leader (in a supervisory role for nearly 8 years) and a supervisor of over 100 employees. But in May of 2022, Plaintiff was being directed to do things that were only non-management and totally humiliating. By way of example, he was being sent to work as a bus aide going house-to-house to pick up children for transport to Philadelphia.

vi. By June of 2022, he was being directed to work in the Drug and Alcohol Unit with no prior experience in that field in non-supervisory roles. He was also directed to give Martori a tour of the entire building (as the new Chief Nursing Officer). These basic tours were traditionally done by the assistants working in clerical capacities.

vii. On June 9, 2022, Plaintiff was yelled at and totally humiliated in the cafeteria by management when he was told there are staffing shortages and he will be helping with the schedule to fill in for others. All Plaintiff had done was inquired about his

8

      supervisory role and why he was being asked to work in non-supervisory job positions. Plaintiff was point-blank yelled at and told he would solely be filling in for mental health technicians or others who called out or where help was needed. Plaintiff was in no uncertain terms told he would be working in non-management job positions. It was evident by June 2022 that he had been functionally demoted.

viii. It had already been shared with Plaintiff that Whitelock did not want him in a management role by other facility management; and as a result, he was doing anything asked of him without any opposition including working as a bus aide and in no less than 3-5 different non-supervisor job roles per week.

ix. Between June and July of 2022, Defendants were making Plaintiff's job so difficult that he couldn't even perform work on certain days or know where he was going. He was being directed to work in a job position and sent to one unit; and by the time he signed in, he would be sent to another unit. Plaintiff was being sent to 4-5 units on some days and being yelled at asking why he didn't get to certain areas quick enough or being asked what he was doing as if he was the one who was somehow incompetent. Other people who worked in the roles in which he was asked to fill in for were only ever assigned <u>to a single unit per day</u>.

    41. For more than a month, Plaintiff called and tried to contact Whitelock to discuss what was happening to him through May and June of 2022, and she ignored him and refused to meet with him. Whitelock was only communicating directives through other management running Plaintiff around and doing things to force him to quit his job. Whitelock only agreed to meet with Plaintiff when he formally complained via e-mail of ongoing harassment. When she met with him in-person, he gave many examples of mistreatment, expressed concerns that he was a supervisor only being used in entry-level job positions, and that he was black -- and cannot believe there is any other reason for this kind of mistreatment other than "discrimination." All Whitelock did was try to get Plaintiff to stop talking, tell him he was valued, and suggested things will get better.

    42. Nothing got better. By way of another example, Plaintiff received an urgent message of a family emergency and requested the use of 3 days off (and use of PTO). Others got time off for emergencies, and Plaintiff had dedicated over 9 years of work and tremendous

overtime without any attendance concern(s). Plaintiff's request was being denied by different managers, and then he was told to check with the staffing coordinator. The staffing coordinator then told Plaintiff that he is supposed to be a supervisor and should not even have to go through her, but that she was told to deny Plaintiff's request(s). After escalating complaints through Human Resources about this issue, Plaintiff was finally given permission to take the 3 days off.

43. But Plaintiff was still only being used in non-management roles and continually assigned to different areas. Defendants were literally doing anything they could to make his work environment so uncomfortable in hopes that he would leave of my own volition.

44. However, Plaintiff refused to resign, and did not leave voluntarily despite the extraordinary hostility.

45. When none of their efforts at forcing him to resign worked, Plaintiff was informed in a meeting on or about August 17, 2022 that his job was being eliminated (through no fault of his own), and was just being subjected to a reduction in force of his role.

46. Plaintiff was also provided with a letter dated August 17, 2022 stating in pertinent part that: "effective August 24, 2022," there will be a "staff reduction" and that it "will result in the elimination of [his] position" and that Plaintiff will be a "permanent layoff."

47. Plaintiff had been assured his performance was not a factor at all, as there would be no legitimacy to such a feigned rationale.

48. As with everything else that was going on with him, it was a totally transparent charade and pretext to terminate his employment.

49. Plaintiff was unaware of any other manager supposedly being affected by *an alleged* reduction-in-force or job elimination – yet Plaintiff was again singled out.

50. And Defendants were surreptitiously interviewing for Plaintiff's role and overall job position <u>prior to</u> his termination notification (for an *alleged* job elimination).

51. Darryl Saylor is a Caucasian male (in his 30s as to age) who was employed with Defendants for approximately 1 year.

52. Saylor is what many people would call a loudmouth who talks about anything and everything, even things that he should keep personal or confidential.

53. Saylor was literally discussing that on August 5, 2022 he was interviewing for Plaintiff's job with Martori.

54. Plaintiff personally saw Saylor meeting with Martori in Martori's office for the interview.

55. Even Plaintiff's staff were coming up to him and telling him that Saylor had shared he was going for Plaintiff's job and was interviewing for his role.

56. This was all rather outrageously in coordination with human resources; and in particular, Courtney.

57. Following termination notification, Plaintiff was told if he wanted, he could work in a non-supervisory role as a mental health technician (a mental health technician requires only a high school diploma or GED).

58. Plaintiff was told he would have a substantially lower pay and would not get a 3% cost-of-living adjustment that management receives.

59. When Plaintiff asked about what shift he would be assigned or what his set schedule would be, he was told he would have no set schedule, as he would only be used as needed, and would not be guaranteed set hours per week, and he could be used anywhere or any shift.

60. It was also implied Plaintiff would be treated as a new employee and new-hire since he had been terminated.

61. Defendants intentionally made it so he could not possibly consider such a role.

62. Plaintiff had complained of mistreatment for being black and/or racial discrimination numerous times before Mahajan's retirement **and** after her retirement to other management, and it was obvious management was orchestrating as much antagonistic behavior toward Plaintiff thereafter in an effort to force him out of the job.

63. Upon terminating Plaintiff based upon this concocted job elimination and reduction-in-force farce, Plaintiff was provided with a letter to sign to get severance pay; Plaintiff was told if he signed the letter indicating a desire for "separation pay," he would be promptly provided with a severance and settlement agreement to sign to get 4 weeks of "separation pay."

64. This was, in Plaintiff's view, a clear ploy to have him waive my legal claims presumably so Saylor could immediately be put in his prior job function with impunity.

65. The hostile work environment was very traumatic for Plaintiff, as was his demotion (functionally as of May 2022) and termination (in August of 2022).

**First Cause of Action**
**42 U.S.C. Section 1981**
**(Wrongful Termination - Racial Discrimination/Retaliation/Hostile Work Environment)**

66. The foregoing paragraphs are fully incorporated herein as though set forth at length.

67. Plaintiff was terminated from Defendant due to his race and/or ethnic characteristics and/or because he engaged in protected activity by complaining of racial

discrimination and was also subject to a hostile work environment due to his race and/or complaints of discrimination.

68. These actions as aforesaid constitute violations of 42 U.S.C. Section 1981.

## Second Cause of Action
## Title VII of the Civil Rights Act of 1964 ("Title VII")
**(Wrongful Termination - Racial Discrimination/Retaliation/Hostile Work Environment)**

69. The foregoing paragraphs are fully incorporated herein as though set forth at length.

70. Plaintiff was terminated from Defendant because of his race and/or national origin and/or because of he engaged in protected activity by complaining of racial discrimination and was also subject to a hostile work environment due to his race, national original and/or complaints of discrimination.

71. Plaintiff properly exhausted his administrative remedies to proceed under Title VII because he timely filed a Charge with the EEOC asserting discrimination and retaliation and filed the instant lawsuit within 90 days of receiving a right-to-sue letter and/or notice of case closure from the EEOC.

72. These actions as aforesaid constitute a violation of Title VII of the Civil Rights Act of 1964.

## Third Cause of Action
## Violations of the Age Discrimination in Employment Act ("ADEA")
**(Age Discrimination)**

73. The foregoing paragraphs are fully incorporated herein as though set forth at length.

74. Plaintiff was terminated due to his advanced age and replaced with someone substantially younger under the false pretenses that his job was being eliminated.

## Fourth Cause of Action
### Violations of Pennsylvania Wage Payment & Collection Law ("WPCL")
(Non-payment of full wages, Unlawful Wage Retention)

75. Defendants also owe Plaintiff more than $5,000.00 in wages (as of termination) that were illegally withheld.

76. Defendants was so desperate for staff or supervisors (not being compliant with regulations for adequate staffing) that Plaintiff was approached and offered $700.00 per employee and $5,000.00 per supervisor he referred and who completes orientation for Defendants.

77. Plaintiff was informed by Whitelock that he was so well liked by staff, families, and had such a large network, that management believed he could single-handedly successfully help staff the facility.

78. These discussions took place in early 2022 (pre-Mahajan retirement).

79. Plaintiff obtained more than a dozen staff members and 2 supervisors by meeting with employees, going house-to-house, creating flyers, reviewing resumes, meeting with potential employees at a gym, discussing applications, and doing everything in his power in-person or by phone to find employees.

80. Plaintiff was very successful, but Whitelock then refused to pay Plaintiff what she promised for these referrals (except for 3 people), then *changing the conditions* and duration in which someone must work for Defendants – after the fact – in order to get paid the remaining referral fees.

81. This is yet another example of how hard Plaintiff worked at Defendants' facility and how they exploited him (even committing wage violations toward).

## Fifth Cause of Action
### Detrimental Reliance, Promissory Estoppel, Unjust Enrichment
**(Assertion of all potentially applicable equitable claims)**

82. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

83. Plaintiff relied upon material representations that he would be compensated a sum certain if he recruited employees to work for Defendants.

84. Plaintiff exerted significant efforts to recruit individuals for employment with Defendants and was successful in doing so, and then met the criterion set forth by Defendants in order to get paid on each hire.

85. Plaintiff did so to his detriment and because of objectively reasonable assurances and beliefs of proper compensation for such work.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendants are to promulgate and adhere to a policy prohibiting discrimination/retaliation violations of Civil Rights Statutes (as set forth herein);

B. Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority.

C. Plaintiff is to be awarded actual damages, as permitted by applicable law;

D. Plaintiff is to be awarded punitive damages to punish Defendants for their willful, deliberate, malicious, and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

E.        Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate;

F.        Plaintiff is to be awarded the costs and expenses of this action and a reasonable attorney's fees as provided by applicable federal and state law.

Respectfully submitted,

KARPF, KARPF & CERUTTI, P.C.

By: _____

Ari R. Karpf
Attorney for Plaintiff
3331 Street Road
Two Greenwood Square, Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated: October 31, 2022

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

McDonald Oliver                                             CIVIL ACTION
v.

Universal Health Services Inc. d/b/a UHS, et al.            NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                                          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.                                                       ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.                    ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.                                                                                            ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)                                                                                                ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.                (X)

| 10/31/2022 | | Plaintiff |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 639-0801 | (215) 639-4970 | akarpf@karpf-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### DESIGNATION FORM
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: 1001 Franklin Street, Croydon, PA 19021

Address of Defendant: 367 South Gulph Road, King of Prussia, PA 19406; 722 East Butler Pike, Ambler, PA 19002

Place of Accident, Incident or Transaction: Defendants place of business

---

**RELATED CASE, IF ANY:**

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes [ ]  No [X]

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes [ ]  No [X]

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes [ ]  No [X]

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes [ ]  No [X]

I certify that, to my knowledge, the within case [ ] is / [X] is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 10/31/2022   _____   ARK2484 / 91538
                   *Attorney-at-Law / Pro Se Plaintiff*      *Attorney I.D. # (if applicable)*

---

**CIVIL:** (Place a √ in one category only)

**A. Federal Question Cases:**
1. [ ] Indemnity Contract, Marine Contract, and All Other Contracts
2. [ ] FELA
3. [ ] Jones Act-Personal Injury
4. [ ] Antitrust
5. [ ] Patent
6. [ ] Labor-Management Relations
7. [X] Civil Rights
8. [ ] Habeas Corpus
9. [ ] Securities Act(s) Cases
10. [ ] Social Security Review Cases
11. [ ] All other Federal Question Cases
    *(Please specify):* _____

**B. Diversity Jurisdiction Cases:**
1. [ ] Insurance Contract and Other Contracts
2. [ ] Airplane Personal Injury
3. [ ] Assault, Defamation
4. [ ] Marine Personal Injury
5. [ ] Motor Vehicle Personal Injury
6. [ ] Other Personal Injury *(Please specify):* _____
7. [ ] Products Liability
8. [ ] Products Liability – Asbestos
9. [ ] All other Diversity Cases
    *(Please specify):* _____

---

### ARBITRATION CERTIFICATION
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Ari R. Karpf, counsel of record *or* pro se plaintiff, do hereby certify:

[X] Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

[ ] Relief other than monetary damages is sought.

DATE: 10/31/2022   _____   ARK2484 / 91538
                   *Attorney-at-Law / Pro Se Plaintiff*      *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

*Civ. 609 (5/2018)*

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
OLIVER, MCDONALD

**DEFENDANTS**
UNIVERSAL HEALTH SERVICES INC. D/B/A UHS, ET AL.

**(b)** County of Residence of First Listed Plaintiff: Bucks
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant: Montgomery
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Karpf, Karpf & Cerutti, P.C.; 3331 Street Road, Two Greenwood Square, Suite 128, Bensalem, PA 19020; (215) 639-0801; akarpf@karpf-law.com

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- 1  U.S. Government Plaintiff
- 2  U.S. Government Defendant
- **X** 3  Federal Question *(U.S. Government Not a Party)*
- 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated or Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- 110 Insurance
- 120 Marine
- 130 Miller Act
- 140 Negotiable Instrument
- 150 Recovery of Overpayment & Enforcement of Judgment
- 151 Medicare Act
- 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- 153 Recovery of Overpayment of Veteran's Benefits
- 160 Stockholders' Suits
- 190 Other Contract
- 195 Contract Product Liability
- 196 Franchise

**REAL PROPERTY**
- 210 Land Condemnation
- 220 Foreclosure
- 230 Rent Lease & Ejectment
- 240 Torts to Land
- 245 Tort Product Liability
- 290 All Other Real Property

**TORTS — PERSONAL INJURY**
- 310 Airplane
- 315 Airplane Product Liability
- 320 Assault, Libel & Slander
- 330 Federal Employers' Liability
- 340 Marine
- 345 Marine Product Liability
- 350 Motor Vehicle
- 355 Motor Vehicle Product Liability
- 360 Other Personal Injury
- 362 Personal Injury - Medical Malpractice

**CIVIL RIGHTS**
- 440 Other Civil Rights
- 441 Voting
- **X** 442 Employment
- 443 Housing/Accommodations
- 445 Amer. w/Disabilities - Employment
- 446 Amer. w/Disabilities - Other
- 448 Education

**TORTS — PERSONAL INJURY**
- 365 Personal Injury - Product Liability
- 367 Health Care/Pharmaceutical Personal Injury Product Liability
- 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- 370 Other Fraud
- 371 Truth in Lending
- 380 Other Personal Property Damage
- 385 Property Damage Product Liability

**PRISONER PETITIONS**
Habeas Corpus:
- 463 Alien Detainee
- 510 Motions to Vacate Sentence
- 530 General
- 535 Death Penalty
Other:
- 540 Mandamus & Other
- 550 Civil Rights
- 555 Prison Condition
- 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- 625 Drug Related Seizure of Property 21 USC 881
- 690 Other

**LABOR**
- 710 Fair Labor Standards Act
- 720 Labor/Management Relations
- 740 Railway Labor Act
- 751 Family and Medical Leave Act
- 790 Other Labor Litigation
- 791 Employee Retirement Income Security Act

**IMMIGRATION**
- 462 Naturalization Application
- 465 Other Immigration Actions

**BANKRUPTCY**
- 422 Appeal 28 USC 158
- 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- 820 Copyrights
- 830 Patent
- 835 Patent - Abbreviated New Drug Application
- 840 Trademark

**SOCIAL SECURITY**
- 861 HIA (1395ff)
- 862 Black Lung (923)
- 863 DIWC/DIWW (405(g))
- 864 SSID Title XVI
- 865 RSI (405(g))

**FEDERAL TAX SUITS**
- 870 Taxes (U.S. Plaintiff or Defendant)
- 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- 375 False Claims Act
- 376 Qui Tam (31 USC 3729(a))
- 400 State Reapportionment
- 410 Antitrust
- 430 Banks and Banking
- 450 Commerce
- 460 Deportation
- 470 Racketeer Influenced and Corrupt Organizations
- 480 Consumer Credit
- 490 Cable/Sat TV
- 850 Securities/Commodities/Exchange
- 890 Other Statutory Actions
- 891 Agricultural Acts
- 893 Environmental Matters
- 895 Freedom of Information Act
- 896 Arbitration
- 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- **X** 1  Original Proceeding
- 2  Removed from State Court
- 3  Remanded from Appellate Court
- 4  Reinstated or Reopened
- 5  Transferred from Another District *(specify)*
- 6  Multidistrict Litigation - Transfer
- 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
TITLE VII (42USC2000); SECTION 1981 (42USC1981); ADEA (29USC621)

Brief description of cause:
Violations of the TITLE VII, SECTION 1981, ADEA and the PHRA.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: **X** Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE: 
DOCKET NUMBER:

DATE: 10/31/2022
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

Print    Save As...    Reset