**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MCDONALD OLIVER, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | No. 22-4353 |
| UNIVERSAL HEALTH SERVICES INC, et al., | : | |
| Defendants. | : | |

**February 29, 2024**                                                          **Anita B. Brody, J.**

## <u>MEMORANDUM</u>

### I.      Introduction

Plaintiff McDonald Oliver brings claims against his former employer, the Horsham Clinic ("Horsham"),[1] alleging violations of 42 U.S.C. § 1981 (Count I), Title VII of the Civil Rights Act of 1964 ("Title VII") (Count II) and the Pennsylvania Human Relations Act ("PHRA") (Count VI) for unlawful retaliation resulting in his termination as a Behavioral Health Educator ("BHE") at Horsham.[2] Oliver also pursues claims for violations of the Pennsylvania Wage Payment & Collection Law ("WPCL"), Detrimental Reliance, Promissory Estoppel and Unjust Enrichment arising out of Horsham's alleged failure to pay promised bonuses for Oliver's efforts to recruit employees to work at Horsham (Counts IV and V).

Defendant Horsham moves for summary judgment on all of Oliver's claims, arguing that Oliver cannot make out a *prima facie* case for retaliation under Title VII, § 1981, or PHRA, and even if he could, he cannot carry the burden under the *McDonnell Douglas* framework of showing

---

[1] Oliver also brought and dismissed claims against Universal Health Services, Inc. *See* ECF No. 33. Defendant Horsham is a subsidiary of Universal Health Services, Inc.

[2] Oliver dismissed his age discrimination claims by Joint Stipulation dated October 11, 2023. *See* ECF No. 33. Oliver later waived all claims of race discrimination and hostile work environment. *See* ECF No. 39 at 11 n.1.

that Horsham's stated legitimate non-discriminatory and non-retaliatory reasons for his position elimination are pretextual. *See* ECF No. 38-1 at 14–29. On the WPCL and state law claims, Horsham argues that Oliver cannot establish a claim on these counts because Oliver cannot show that Horsham breached a contract or agreement. *See id*. at 32. Horsham's Motion for Summary Judgment (ECF No. 38) will be denied.

### A. Background on Retaliation Claims[3]

The Horsham Clinic ("Horsham") offers behavioral health treatment services to children, adolescents and adults and offers dual-diagnosis treatment for adults who struggle with drug and alcohol addiction. In 2013, Plaintiff Oliver, an African American male born and raised in Nigeria, began working for Horsham as a Mental Health Technician ("MHT") and Group Lead. On July 6, 2021, Mr. Oliver was promoted to the role of Behavioral Health Educator ("BHE"). Oliver was the first BHE at Horsham, although BHE positions existed previously and continue to exist at other facilities run by Horsham's parent company, Universal Health Services, Inc., a former defendant. *See* ECF No. 43 at 4. In his BHE role, Oliver was responsible for the education and training of MHTs as well as ongoing in-service trainings. Around October 2021, Oliver received a positive formal review of his first 90 days as BHE. *See* ECF No. 39-2, Exhibit E, at 1–3.

As part of Mr. Oliver's promotion to BHE, he was given an office to assist with performing his duties when he was not working on the floor. ECF No. 39-2, Exhibit A ("Oliver Dep."), at 116:7–12. Oliver alleges that, on October 15, 2021, he arrived at his office and a colleague he had never met was working in his office. The colleague allegedly claimed that it was her office, refused to share the office space with him, and said "I don't want my things to go missing." *Id*. at 129:22– 24. The next day, Oliver noticed his name and office space had been removed from the telephone

---

[3] The facts are presented in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

directory. *Id*. at 117:22–24; 118:1–24. Oliver complained to his supervisor, Chief Nursing Officer Joan Mahajan, that he believed his colleague's refusal to share an office with him was based on his race.[4] Oliver was then re-assigned an office more than a block away from where he completed his duties. ECF No. 39 at 13.

In December 2021, Mahajan issued Oliver a "Final Written Warning" for two incidents, including his handling of an unruly patient and for what Oliver describes as innocuous jokes he had made during a tour. *Id*. at 13–14; ECF No. 39-2, Exhibit G ("Mahajan Dep.") 22:19–24:2; Oliver Dep. 239:7–241:5; ECF No. 39-2, Exhibit M. Oliver alleges that the standard response at Horsham for improper holds on patients would have been preventative counseling, not a Final Written Warning. ECF No. 39 at 13–14; see ECF No. 39-2, Exhibit N.[5]

Also around December 2021,[6] Horsham CEO Kimberly Whitelock discussed with Mahajan whether Oliver's position was "as effective" as they had hoped and Whitelock mentioned that "she didn't know if she would continue with [Oliver's BHE position]." Mahajan Dep. 16:15–24. In response, Mahajan testified that she suggested that Whitelock give the position a little while longer "because someone had come from corporate who had . . . done a lot of one-to-one time with [Oliver] and had given him a lot of training and support and guidance. And I said I felt that, you know, let's see how that goes, that that should really help him to hone his skills and see how it works." *Id*. at 16:23–17:7.

On April 30, 2022, Mahajan retired as Chief Nursing Officer. Mahajan testified that about

---

[4] Oliver alleges that Mahajan recognized the possibility that Oliver's officemate was motivated by race-based animus as, when asked if the officemate's issue with Oliver was "a color problem," Mahajan replied "Unfortunately." Oliver Dep. 123:1–23.
[5] This Final Written Warning was reflected on Horsham's "Reduction in Force Analysis" chart, dated August 1, 2022, which listed the BHE position for job elimination. *See* ECF No. 39-2, Exhibit R.
[6] Mahajan testified that the initial discussions about eliminating the BHE role began "about six months prior to my retirement." Mahajan Dep. 16:15–24. Mahajan retired on April 30, 2022.

three or four weeks before she retired, Mahajan and Whitelock again discussed the possibility of eliminating Oliver's BHE role. Mahajan Dep., at 19:19–20:5. Mahajan testified she left the future of the BHE position in Whitelock's hands upon her retirement. *Id.* at 20:2–5.

Beginning on May 2, 2022, Oliver was instructed to take on new tasks outside of the scope of his BHE job description, including serving as a bus aide for a day. On May 10, 2022, Oliver was placed to work in the Drug and Alcohol Unit as a Mental Health Technician ("MHT") working on the floor, which he interpreted as a functional demotion. Oliver was no longer performing the majority of his duties as a BHE, such as assisting with tours of new staff or training new staff. Indeed, during this time of lessened job responsibilities with no official demotion, other employees allegedly reached out to Oliver asking when he had been demoted. *See* ECF No. 39 at 14.

On August 5, 2022, Mr. Oliver received a phone call from a colleague informally notifying him that he had been demoted from his BHE position and that another colleague had been recommended for the role in his place. Oliver Dep. at 111:19–112:8. On August 17, 2022, Oliver received a letter stating that Horsham "will be implementing a staff reduction, which will result in the elimination of your position and your permanent layoff. This staff reduction is a result of position elimination." *See* ECF No. 39-2, Exhibit T. The only "staff reduction" was that of Oliver's position. It is undisputed that no one has replaced Oliver in the BHE position at Horsham. *See* ECF No. 43 at 4; ECF No. 39-2, Exhibit D ("Whitelock Dep.") at 19:12–15. Oliver was offered to remain at Horsham as an MHT, which he refused. ECF No. 38-2 at ¶¶ 96–99.

## B. Background on WPCL and State Law Claims (Detrimental Reliance, Promissory Estoppel and Unjust Enrichment)

Around the time of Oliver's promotion to BHE, Oliver alleges that he was told by Mahajan and Horsham's HR director Kevin Courtney that, due to staffing shortages, he could receive monetary bonuses for recruiting new employees. Oliver Dep., at 181:3–23. This recruitment

policy, Oliver claims, differs from the "referral" policy in place at Horsham, pursuant to which current employees could receive bonuses when new applicants list a current employee's name on their application as having referred them to Horsham. Under the referral policy, half of a referral bonus is paid after the new employee worked for 90 days, and the other half after the new employee completed one year at Horsham. Oliver alleges that a separate *recruitment* policy was also in place, pursuant to which he would be compensated $500 for each recruit—which was then increased to $700 for each recruit—*immediately* upon the recruit's hiring. *Id*. at 181:15–23. Oliver claims he was never properly compensated for 12 recruits. Oliver Dep., at 343:1–24.

## II.    Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Id.* In ruling on a motion for summary judgment, the court must draw all inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party has met its initial burden, the nonmoving party must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

Both parties must support their factual positions by: "(A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The materials in the record that parties may rely on include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A). In opposing a motion for summary judgment, the nonmoving party may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

## III.   Discussion

### A.   Retaliation under Title VII, § 1981, and PHRA

Oliver contends that Horsham retaliated against him in violation of his rights under Title VII, § 1981, and the PHRA.[7] Oliver's retaliation claims under Title VII, § 1981, and the PHRA

---

[7] Title VII prohibits employers from retaliating against employees who oppose discriminatory employment practices or file their own charges of discrimination. *See* 42 U.S.C. § 2000e–3(a). Section 1981 protects individuals against retaliation, and the same standards apply to Title VII and § 1981 retaliation claims. *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 451 (2008); *Est. of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 n.14 (3d Cir. 2010). The PHRA also prohibits an employer from discriminating against employees who oppose discrimination or file charges of discrimination. 43 PA. CONS. STAT. § 955(d). While Pennsylvania courts are not bound in their interpretations of Pennsylvania law by federal interpretations of parallel provisions in Title VII, its courts nevertheless generally interpret the PHRA in accord with its federal counterparts. *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083–1084 (3d Cir. 1995).

6

are governed by the *McDonnell Douglas* burden-shifting analysis, and therefore will be considered together. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999) (applying burden-shifting framework to Title VII, § 1981, and PHRA claims). Under the *McDonnell Douglas* analysis, a plaintiff bears the burden of first establishing a *prima facie* case under each of the statutes. If the plaintiff succeeds in establishing his *prima facie* case, the burden then shifts to the moving party to articulate a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. This burden is one of production, not persuasion. *Smith v. City of Allentown*, 589 F.3d 684, 690 (3d Cir. 2009). If the moving party offers a legitimate, non-discriminatory reason, a plaintiff must demonstrate that the defendant's legitimate, non-discriminatory reason was not the actual reason, but rather was a pretext for discrimination. *See Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). Specifically, a plaintiff must "point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Notwithstanding the burden-shifting framework, plaintiff always bears the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against him. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 799 n.10 (3d Cir. 2003).

To establish a prima facie case of retaliation, Oliver must prove that (1) he engaged in protected activity; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

Oliver's retaliation claim is advanced under a cat's paw theory, alleging that the illegal animus of another employee proximately caused his termination. Accordingly, to survive summary judgment based on a cat's paw theory of liability, Oliver must also establish (1) a genuine issue of material fact concerning the bias of the subordinate, and (2) a genuine issue of material fact "as to whether the proffered reason for the employment action is pretextual, which in a [cat's paw] claim requires the plaintiff to demonstrate a causal relationship between the subordinate's actions and the employment decision." *Mason v. Se. Pa. Transp. Auth.,* 134 F. Supp. 3d 868, 874 (E.D. Pa. 2015) (quoting *E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 488 (10th Cir. 2006)).[8]

The following subsections will cover the three elements of a *prima facie* case of retaliation, as well as the subsequent steps of the *McDonnell Douglas* framework, requiring Horsham to articulate a legitimate, non-discriminatory reason for Oliver's termination, and Oliver's required showing that Horsham's stated reason is pretextual.

### 1. Protected Activity

The Third Circuit has held that formal and informal complaints of discrimination constitute

---

[8] There is a doctrinal tension between the cat's paw theory and the *McDonnell Douglas* framework because "the cat's paw theory originated in the context of mixed-motive discrimination claims," *Kowalski v. Postmaster Gen. of U.S.*, 811 F. App'x 733, 739 (3d Cir. 2020); *Diaz v. Tyson Fresh Meats, Inc.*, 643 F.3d 1149, 1151 (8th Cir. 2011) (noting the "uneasy marriage between the *McDonnell Douglas* framework and a cat's paw theory of employer liability"); *see also Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 427 n.3 (6th Cir. 2014) (declining to consider "whether and to what extent cat's paw liability fits into the [*McDonnell Douglas*] framework). Despite this tension, the Third Circuit and several other Courts of Appeals have applied the cat's paw theory of liability in the pretext step of the *McDonnell Douglas* framework. *See, e.g.*, *Durst v. City of Phila.*, 798 F. App'x 710, 714 (3d Cir. 2020) (applying cat's paw theory during pretext step of *McDonnell Douglas* framework); *Neidigh v. Select Specialty Hosp.-McKeesport*, 664 F. App'x 217, 222 (3d Cir. 2016) (same); *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 70 (1st Cir. 2015) (same); *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (same); *but see DeNoma v. Hamilton Cty. Ct. of Common Pleas*, 626 F. App'x 101, 105 (6th Cir. 2015) (analyzing *McDonnell Douglas* steps and cat's paw elements separately). Following Third Circuit precedent, this court will analyze Oliver's cat's paw argument in the pretext step of the *McDonnell Douglas* framework. This requires Oliver to satisfy all the elements of cat's paw liability in order to prove pretext.

protected activities. *See Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265, 288 (3d Cir. 2001) ("[T]he complaints to [defendant], whether oral or written, formal or informal, are sufficient to satisfy the first prong of the prima facie case, provided the complaints expressed [Plaintiff's] opposition to a protected activity under Title VII"). "[P]rotesting what an employee believes in good faith to be a discriminatory practice is clearly protected conduct." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996). To prove that their conduct constitutes protected activity, plaintiffs must show that they did more than complain generally about unfair treatment, but instead complained specifically about unlawful discrimination. *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995).

Oliver argues that he engaged in protected activity on October 15, 2021 when he complained to his supervisor, Joan Mahajan, regarding what he believed to be racial discrimination against him by a colleague sharing his office. Oliver was specific in his complaint to Mahajan that he suspected race discrimination, and asked Mahajan, "Joan, what is it, a color problem? Tell me. I can handle it. I'm a big boy. What is it?" Oliver Dep., at 120:5–8.

Horsham argues that Oliver's complaint to Mahajan in October 2021 cannot serve as basis for Oliver's retaliation claim under Title VII and PHRA because the complaint took place more than 300 days before Oliver filed his Equal Employment Opportunity Commission ("EEOC") complaint on September 14, 2022. Horsham is mistaken. To bring suit under Title VII, a claimant in a deferral state, such as Pennsylvania, must first file a complaint with the EEOC within 300 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e–5(e)(1). "Discrete discriminatory acts," which include termination, failure to promote, denial of transfer, or refusal to hire, are "not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002). Horsham's argument

fails here because the relevant "discrete discriminatory act" that must have occurred within 300 days of the September 14, 2022 EEOC complaint was Oliver's August 17, 2022 termination, *not* Oliver's complaint to Mahajan about his colleague. Therefore, Oliver's October 2021 complaint to Mahajan constitutes a complaint of discrimination that satisfies the first prong of the *prima facie* case.

### 2.    Adverse Employment Action

An adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)). It "must constitute 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Anderson v. Mercer Cnty. Sheriff Dep't*, 815 F. App'x 664, 666 (3d Cir. 2020) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

Oliver can establish this second element of the *prima facie* retaliation claim because Horsham took an adverse employment action against him by terminating his position on August 17, 2022.

### 3.    Causal Connection

Oliver must show that there was a causal connection between his participation in the protected activity and the adverse employment action. A plaintiff does not need to prove "but for" causation at the *prima facie* stage, as such a standard would abrogate the *McDonnell Douglas* burden-shifting framework. *See Carvalho-Grevious v. Delaware State University*, 851 F.3d 249, 259 (3d Cir. 2017). Rather, the question is whether the plaintiff has "produced evidence from

which a reasonable factfinder could conclude that her engagement in a protected activity was the *likely reason* for the adverse employment action." *Id.* at 259.

On this prong, the court may consider "a broad array of evidence." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000). "Unusually suggestive" temporal proximity between protected activity and adverse action may be sufficient to establish an inference of causality. *Id.* at 280; *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001). However, "the mere fact that adverse employer action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997), *abrogated on other grounds*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006). "If the temporal proximity is not unusually suggestive, a court may consider whether the record evidence, as a whole, is sufficient to raise an inference of causation." *Kahan v. Slippery Rock Univ. of Pa.*, 50 F. Supp. 3d 667, 701 (W.D. Pa. 2014) (citing *Farrell*, 206 F.3d at 280). Such record evidence may include "evidence of ongoing antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *Id.*

Oliver aims to show causation through circumstantial evidence of "ongoing antagonism" and "retaliatory animus" in the intervening period between his complaint to Mahajan in October 2021 and his termination in August 2022. *See* ECF No. 39 at 25. Most significantly, Mahajan issued Oliver a final written warning on December 6, 2021 for two incidents involving Oliver's alleged inappropriate comments on a tour and an improper hold on a patient. This final written warning came only two months after Oliver's protected complaint of alleged discriminatory mistreatment by a colleague and despite Horsham's past history of correcting such issues via

"preventative counseling." *See* ECF No. 39-2, Exhibit N.

Oliver also argues that "he experienced continuous harassment, antagonism and hostility no less than six (6) times leading up to his termination on August 17, 2022." ECF No. 39 at 26. Many of these alleged instances involved Oliver's job responsibilities being lessened and Oliver being forced to perform tasks that were not part of the BHE job description (including performing studies on sexual incidents of adolescents, becoming a "bus aide," and working on the drug and alcohol unit) and that he considered to be a functional demotion. *See* ECF No. 39 at 27. As of May 2, 2022, Mr. Oliver was no longer performing the majority of his duties as a BHE, such as conducting trainings. Instead, he was only working in one unit, which was not typical for this position. *See* ECF No. 39 at 28 n.11.

As Horsham emphasizes, it is undisputed that the ultimate decisionmaker for the job termination was Horsham CEO Kimberly Whitelock. There is no explicit evidence in the record that Mahajan reported Oliver's complaint about Oliver's officemate to Whitelock. *See* ECF No. 42 at 5; Whitelock Dep. 21:23–22:5. In general, a plaintiff cannot establish that there was a causal connection for a retaliation claim without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted. *See Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007); *Moore v. City of Phila.*, 461 F.3d 331, 351 (3d Cir. 2006); *cf. Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct.").

To get around this roadblock, Oliver presents the cat's paw theory, under which Horsham may be liable for employment discrimination if the source of illegal animus was not the final employment decisionmaker—Kimberly Whitelock—but rather another employee—Joan

Mahajan—whose animus proximately caused the adverse employment action at issue in the case. *See McKenna v. City of Phila.,* 649 F.3d 171, 178 (3d Cir. 2011). As discussed below under Section III.A.5. (Pretext), a cat's paw theory is evaluated under the pretext step. *See, e.g.*, *Durst v. City of Phila.*, 798 F. App'x 710, 714 (3d Cir. 2020). In this case, however, it bears significant relevance for causation as well.

Cat's paw liability requires a causal relationship between the actions of a subordinate and the employment decision. A plaintiff must show proximate cause—"'some direct relation between the injury asserted and the injurious conduct alleged' and exclud[ing] links that are 'remote, purely contingent, or indirect.'" *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 330 (3d Cir. 2015) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011)); *Lamb v. Montgomery Twp.*, 734 F. App'x 106, 113 (3d Cir. 2018) (noting requirement of proximate cause in cat's paw cases). The Third Circuit has clarified that cat's paw liability in retaliation cases requires that the non-decisionmaker was motivated by a "desire to retaliate," the non-decisionmaker communicated with the decisionmaker, and the decisionmaker relied on the non-decisionmaker's communication in taking adverse action against plaintiff.[9] *See Crosbie v. Highmark Inc.*, 47 F.4th 140, 145–46 (3d Cir. 2022).

Here, inconsistencies in Horsham's articulated reasons for terminating Oliver are sufficient to support the inference of retaliatory animus and to establish a genuine dispute of material fact as

---

[9] In *Staub v. Proctor Hospital,* 562 U.S. 411 (2011), the Supreme Court declined to adopt a "hard-and-fast rule" that an employer's intervening exercise of independent judgment (*e.g.,* between the supervisor's biased report of employee wrongdoing and the termination of the employee) precludes a finding of proximate cause. 562 U.S. at 420. But the Supreme Court did indicate that proximate cause will not exist when the employer does not rely on the "supervisor's biased report" in taking the ultimate adverse action. *Id.* at 421 (noting that it "is necessary in any case of cat's-paw liability" that "the independent investigation rel[y] on facts provided by the biased supervisor"). While *Staub v. Proctor Hospital*, 562 U.S. 411 (2011) involved the question of employer liability under the Uniform Services Employment and Reemployment Rights Act, the Third Circuit held that the underlying agency principles set forth in *Staub* "apply equally to all types of employment discrimination." *Marcus v. PQ Corp.,* 458 F. App'x 207, 211 (3d Cir. 2012) (citing *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 949–50 (10th Cir. 2011)).

to Whitelock's reliance on such retaliatory animus. It is undisputed that around the time of

Mahajan's December 2021 final written warning to Oliver, Horsham CEO Whitelock began

discussing Oliver's BHE role with Mahajan and others to evaluate whether the BHE position was

"impactful." *See* Whitelock Dep., at 12:1–24. Yet, as Oliver argues, despite the numerous meetings

that were purportedly held on the question of the impact and future of the BHE position, the record

is devoid of any contemporaneous internal documents reflecting what Whitelock or anyone else

was discussing or evaluating regarding the BHE role. *See* ECF No. 39 at 29–30. Horsham claims

that, in assessing whether or not the BHE position was effective, Whitelock relied on "statistics"

to track the productivity of Mental Health Technicians ("MHTs"), observed MHTs on the units,

reviewed MHT retention, and considered feedback from others. Whitelock Dep. 12:6–17:16.

While overseeing MHTs was a large part of Oliver's BHE role, as Oliver notes, there are no emails

wherein Whitelock asks staff or on-site personnel for any data on the trainings Oliver conducted,

MHT staff turnover, or any other alleged 'productivity factors.' *See* ECF No. 39 at 30. The only

document in the record reflecting Horsham's consideration of Oliver's position prior to his

termination is a chart labeled "Reduction in Force Analysis," dated August 1, 2022, which simply

lists the BHE position for job elimination. *See* ECF No. 39-2, Exhibit R. Notably, the "Reduction

in Force Analysis" chart also lists Oliver's Final Written Warning from December 2021 in the

column on "Documented Corrective Action Reports." *Id*. The BHE position is the only position

slated for a job elimination despite a claimed "staff reduction." *See* ECF No. 39-4 at ¶ 94.

At this stage, given the lack of documentation of concerning the position elimination, as

well as the close proximity between Oliver's October 2021 complaint to Mahajan, Oliver's

December 2021 Final Written Warning issued by Mahajan, and the beginning of Mahajan and

Whitelock's discussions about eliminating Oliver's position around December 2021, a genuine

dispute of material fact remains as to whether retaliatory animus proximately caused the termination.

### 4. Horsham's legitimate non-retaliatory reasons

If Oliver is able to establish a *prima facie* claim for retaliation, the Court's analysis shifts to the second step of the *McDonell Douglas* framework, requiring Horsham to "articulate a legitimate, non-discriminatory reason for the adverse employment action." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). Horsham has only "relatively light burden" of production on this step. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Horsham contends that the BHE position was created to provide more support for MHTs and attempt to decrease the high staffing turnovers of MHTs. ECF No. 38-1 at 4–5. Horsham argues that it eliminated the BHE position because it did not have the intended impact, and testimony from Horsham's employees sufficiently supports this rationale. Horsham further contends that the functional demotion Oliver experienced when he was assigned tasks outside of his job description was due to the fact that Horsham was severely short-staffed with MHTs, and every employee that could provide patient care, regardless of their position, was being asked to work the floor. ECF No. 38-2 at ¶¶ 74–75; ECF No. 39-2, Exhibit O ("Martori Dep.") 14:4–6. These explanations meet Horsham's "relatively light" burden of production under *McDonnell Douglas*. *Tomasso v. Boeing Co*., 445 F.3d 702, 706 (3d Cir. 2006) (citing *Fuentes*, 32 F.3d at 763).

### 5. Pretext

Based on Horsham's evidence of a legitimate non-discriminatory reason for Oliver's termination, the burden shifts back to Oliver at the third step of the *McDonnel Douglas* analysis to show that Horsham's explanation is pretextual. To survive a motion for summary judgment on the pretext prong, a nonmoving plaintiff must submit evidence which: (1) "casts sufficient doubt upon

each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication;" or (2) "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994). To discredit Defendant's non-discriminatory reason, Plaintiff "cannot simply show that the [Defendant's] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the [Defendant], not whether the [Defendant] is wise, shrewd, prudent, or competent." *Id*. at 765. Plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [Defendant's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the [Defendant] did not act for [the asserted] non-discriminatory reasons." *Id*. (internal citations and quotation marks omitted). "The factfinder may infer from the combination of the plaintiff's prima facie case, [and Plaintiff's] own rejection of the employer's proffered nondiscriminatory reason, that the employer unlawfully discriminated against the plaintiff and was merely trying to conceal its illegal act with the articulated reason." *Brewer v. Quaker State Oil Ref. Corp*., 72 F.3d 326, 331 (3d Cir. 1995).

Because Oliver is advancing a cat's paw theory based on alleged retaliatory animus of a non-decisionmaker, Oliver must establish that there is a genuine issue of material fact as to (1) the animus of the subordinate, and (2) whether the subordinate's animus translated into retaliatory actions that caused the decisionmaker to take adverse employment action. *See Mason v. Se. Pa. Transp. Auth.,* 134 F. Supp. 3d 868, 874 (E.D. Pa. 2015); *see also Crosbie v. Highmark Inc*., 47 F.4th 140, 145–46 (3d Cir. 2022). In cat's paw cases, "the relevant question is whether a bias-motivated action was the proximate cause of the ultimate employment action." *Smith v. Comhar,*

*Inc.*, 722 F. App'x 314, 318 (3d Cir. 2018) (citing *Staub*, 562 U.S. at 422).

The evidence Oliver marshals to support an inference of retaliatory animus by Mahajan includes that he complained to Mahajan about what he reasonably believed to be racial discrimination by an officemate in October 2021; Mahajan issued Oliver a Final Written Warning in December 2021 when less serious warnings were the norm; and around the same time, Mahajan began engaging in discussions with Whitelock about whether Oliver's BHE role should be eliminated. Additionally, Oliver's Final Written Warning from December 2021 was reflected in Horsham's "Reduction in Force Analysis" chart listing the BHE position for elimination. *See* ECF No. 39-2, Exhibit R. As Horsham argues, however, it is undisputed that Whitelock was not informed about Oliver's complaint of race discrimination and that Whitelock made the final decision to eliminate the position. *See* ECF No. 38-2 ¶ 93; Whitelock Dep. 21:23–22:5. Moreover, the inference that Mahajan exhibited retaliatory animus against Oliver is undercut by deposition testimony suggesting that she urged Whitelock to give Oliver more time in his position, Mahajan Dep. 16:23–17:7, and that Whitelock made the decision to terminate the BHE position after Mahajan's retirement in April 2022. *See* ECF No. 38-2 ¶¶ 89–94.

As discussed above in Section III.A.3. (Causal Connection), Oliver's strongest argument concerns a lack of documentation indicating how Horsham made the decision to terminate Oliver's position. *See Johnson v. Verizon Servs. Corp.*, No. 16-1023, 2017 U.S. Dist. LEXIS 59472, at *12 (E.D. Pa. Apr. 18, 2017) (finding that there was a genuine dispute of material fact as to pretext and denying summary judgment where there was a "lack of documentation concerning [the plaintiff's] termination" and where the Court "only has before it dueling narratives provided . . . as to the motivation for [the plaintiff]'s termination"). "Subjective evaluations are more susceptible of abuse and more likely to mask pretext." *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313,

320 (3d Cir. 2000) (quoting *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990)). While Horsham claims that Whitelock had numerous meetings and studied statistics on productions, there is a lack of contemporaneous internal documents reflecting any meetings, emails, studies, or reports geared toward evaluating the success of the BHE role. Despite claims the role was not performing, Oliver's "Current Performance Appraisal Score" listed on Horsham's "Reduction in Force Analysis" chart was a 4.1 out of 5. *See* ECF No. 39-2, Exhibit R. Moreover, Oliver argues that turnover rates at Horsham in 2022 were not significantly different than they had been in 2021 when he was promoted. *See* ECF No. 39-2, Exhibit X.

As discussed above, given the lack of documentation concerning the position elimination, a genuine dispute of material fact remains as to the motivation for Oliver's termination. Oliver "is entitled to have this credibility dispute resolved by a jury." *Sanders v. Nicholson*, 316 F. App'x. 161, 166–67 (3d Cir. 2009). Therefore, I will deny Horsham's Motion for Summary Judgment as to Oliver's retaliation claims under Title VII, § 1981, and the PHRA.

## B. WPCL and State Law Claims (Detrimental Reliance, Promissory Estoppel and Unjust Enrichment)

Oliver pursues claims for violations of the Pennsylvania Wage Payment & Collection Law ("WPCL") (Count IV), as well as state law claims of Detrimental Reliance, Promissory Estoppel and Unjust Enrichment (Count V) arising out of Horsham's failure to pay promised wages for efforts to recruit various employees to work at Horsham. For the WPCL claim, Oliver alleges that he had an oral contract with Horsham to "recruit" new employees—wholly separate from the existing Horsham policy relating to "referrals"—under which Oliver claims that he was never properly compensated for 12 recruits he brought to Horsham. In the alternative, Oliver alleges that Horsham made promises to him that, while perhaps not amounting to a contract, establish state

law equitable claims based on his reliance on those promises.[10] Horsham's position is that no such recruitment agreement existed, only a referral policy. Accordingly, Oliver was not compensated for his claimed 'recruits' because, as the new employees were actually 'referrals,' Oliver could only be paid if the referred employees listed him on their application, and Oliver's claimed 'recruits' failed to do. *See* ECF No. 38-1 at 33–35.

To state a WPCL claim, "the employee must aver a contractual entitlement to 'compensation from wages' and a failure to pay that compensation." *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 954 (Pa. Super. Ct. 2011) (quoting *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 716 (Pa. Super. Ct. 2005)). "Wages" for purposes of the WPCL include "all earnings of an employee, regardless of whether determined on time, task, piece, commission or other method of calculation" and "fringe benefits or wage supplements," such as bonuses or "any other amount to be paid pursuant to an agreement to the employee[.]" 43 PA. CONST. STAT. ANN. § 260.2a. "[A]bsent a formal employment contract or collective bargaining agreement, an employee raising a WPCL claim would have to establish, at a minimum, an implied oral contract between the employee and employer." *Braun*, 24 A.3d at 954 (citing *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir.2003)). "The burden of proving the existence of a contract lies with the party relying on its existence." *Edmondson v. Zetusky*, 674 A.2d 760, 764 (Pa. Commw. Ct. 1996). "To establish the existence of an agreement, one must show that: (1) both parties have manifested an intention to be bound by the terms of the agreement;[11] (2) the terms of the agreement are

---

[10] "A plaintiff is permitted to plead alternative theories of recovery based on breach of contract and unjust enrichment in cases where there is a question as to the validity of the contract in question." *Jacoby Donner, P.C. v. Aristone Realty Capital, LLC*, No. 17-2206, 2020 WL 5095499, at *13 (E.D. Pa. Aug. 28, 2020) (citing *Premier Payments Online, Inc. v. Payment Sys. Worldwide*, 848 F. Supp. 2d 513, 527 (E.D. Pa. 2012)).

[11] Where an oral contract is involved, "'courts must look to surrounding circumstances and course of dealing between the parties in order to ascertain their intent.'" *Szymanski v. Sachetta*, No. 10-cv-2336, 2012 WL

sufficiently definite to be specifically enforced; and, (3) there is mutuality of consideration." *Redick v. Kraft, Inc.*, 745 F. Supp. 296, 300 (E.D. Pa. 1990) (citing *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 298–99 (3d Cir. 1986)). "For a contract to be enforceable, the nature and extent of the mutual obligations must be certain, and the parties must have agreed on the material and necessary details of their bargain." *Lackner v. Glosser*, 892 A.2d 21, 30 (Pa. Super. Ct. 2006).

"A cause of action under detrimental reliance or promissory estoppel arises when a party relies to his detriment on the intentional or negligent representations of another party, so that in order to prevent the relying party from being harmed, the inducing party is estopped from showing that the facts are not as the relying party understood them to be." *Rinehimer v. Luzerne Cty. Cmty. Coll.*, 539 A.2d 1298, 1306 (Pa. Super. Ct. 1988). Promissory estoppel and detrimental reliance claims are treated interchangeably by Pennsylvania courts. *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 634 n.15 (3d Cir. 2013). A claim for promissory estoppel requires that the plaintiff show that (1) the defendant made a promise that he should have reasonably expected to induce the plaintiff to act or refrain from acting, (2) the plaintiff actually relied on the promise and either took, or refrained from taking, action, and (3) enforcing the promise is the only way to avoid injustice. *Crouse v. Cyclops Indus.,* 745 A.2d 606, 610 (Pa. 2000). The second prong of this analysis is often referred to as "detrimental reliance." *See, e.g., Pane v. RCA Corp.,* 868 F.2d 631, 638 (3d Cir. 1989). "A party asserting a claim of estoppel has the burden of establishing all the essential elements." *Thatcher's Drug Store v. Consolidated Supermarkets,* 636 A.2d 156, 160 (Pa. 1994).

"Unjust enrichment is an equitable remedy, defined as 'the retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably

---

246249, at *4 (E.D. Pa. Jan. 26, 2012) (quoting *Boyle v. Steiman*, 631 A.2d 1025, 1033 (Pa. Super. Ct. 1993)).

expected, and for which the beneficiary must make restitution.'" *Commonwealth v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1034 (Pa. 2018) (quoting *Roethlein v. Portnoff Law Assocs., Ltd.*, 81 A.3d 816, 825 n.8 (Pa. 2013)). For Plaintiffs to prove unjust enrichment, they must show that "1) [they] conferred benefits on the defendant, 2) the defendant appreciated such benefits, and 3) the benefits were accepted and retained under such circumstances that it would be inequitable for the defendant to retain the benefit without the payment of value." *Berardi v. USAA Gen. Indem. Co.*, 606 F. Supp. 3d 158, 163 (E.D. Pa. 2022) (citing *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. Ct. 1999)). A benefit that is conferred upon a defendant is not unjustly retained where a plaintiff confers such benefit in the hope of obtaining a future benefit in return. *Burton Imaging Grp. v. Toys "R" Us, Inc.*, 502 F. Supp. 2d 434, 440 (E.D. Pa. 2007).

The WPCL and state law claims all turn on the existence and nature of the promises or agreement between Horsham and Oliver as to the recruitment of new employees. Oliver argues that he had an oral contract with Horsham's HR director Kevin Courtney that he would be paid $700 per employee he recruited to work at Horsham. Oliver alleges that, unlike Horsham's referral policy, this oral contract included no conditions on the payment of the bonus, such as requiring that the recruited employees work at Horsham for a certain period of time before awarding a bonus to the recruiter, or that the employees verify that they were recruited by Oliver. *See* ECF No. 39 at 32–33. The only record evidence Oliver can point to support his understanding of the recruitment agreement is his own deposition testimony and affidavit, however. *See* ECF No. 39-2, Exhibits A and S.

Horsham argues that Oliver cannot show that a contract existed under which Horsham was obligated to pay Oliver more than Horsham has already paid him. *See* ECF No. 38-1 at 33. It is undisputed that Horsham has a Staff Referral Policy pursuant to which existing Horsham

employees can refer new employees and receive a referral bonus, half of which is paid after the new employee has worked at Horsham for 90 days and the other half of which is paid after the new employee has worked at Horsham for a year. *See* ECF No. 39-2, Exhibit S; ECF No. 39-2, Exhibit B ("Courtney Dep.") 31:10–24; 32:1–7; ECF No. 38-3, Exhibit H ("Cowan Decl.") ¶¶ 5–7. New employees can identify their referral source on their application or later after they start as long as both the current and new employee confirm the referral. Cowan Decl. ¶¶ 9–11. Horsham contends that Oliver's argument is contrary to the record evidence which shows he was paid pursuant to the Horsham's Referral Program for three employees, ECF No. 38-1 at 34, and that he never complained during his employment with Horsham that he was entitled to additional referral (or recruiting) bonuses for the remaining 12 employees he claims he recruited. ECF No. 42 at 11; Cowan Decl. ¶¶ 13–19.

The question of whether an undisputed set of facts establishes a contract is typically one of law, but where the facts are in dispute, the question of whether a contract was formed is for the jury to decide. *Ingrassia Constr. Co. v. Walsh,* 486 A.2d 478, 482 (Pa. Super. Ct. 1984). "What was said and done by the parties as well as what was *intended* by what was said and done by them are questions of fact for the jury." *Solomon v. Luria,* 246 A.2d 435, 438 (Pa. Super. Ct. 1968) (emphasis added). Given that the intent of the parties to be bound is a requisite element of contract formation, "oral contracts make it particularly difficult to extricate the matters of law from the questions of fact. Nevertheless, the allegation that an oral contract exists does *not* automatically entitle a plaintiff to a jury trial." *Quandry Sols. Inc. v. Verifone Inc.*, No. CIV.A.07-097, 2009 WL 997041, at *6 (E.D. Pa. Apr. 13, 2009). At the summary judgment stage, the court must determine whether a reasonable jury, considering the parties' undisputed actions and words, could find that they formed a binding oral contract. Here, a material factual dispute exists as to the nature of the

promise(s) made to Oliver regarding recruitment, which need not rise to the level of a contract in order for Oliver's state law claims to survive. *See* ECF No. 39 at 33. Therefore, I will deny Horsham's summary judgment motion as to these claims.

## IV.    Conclusion

Oliver's retaliation claims under Title VII, § 1981, and the PHRA survive summary judgment as genuine disputes of material fact remain as to both causation and pretext. As for Oliver's WPCL and state law claims relating to his claimed recruitment agreement with Horsham, the nature of the promises made to Oliver are a factual question for a jury. Therefore, I will deny Horsham's Motion for Summary Judgment (ECF No. 38).

s/ANITA B. BRODY, J.
ANITA B. BRODY, J.